STATE OF MISSOURI EX REL. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI.—53 S. W. (2d) 868.

Division One, October 22, 1932.*

---

*E. T. Miller, A. P. Stewart* and *C. H. Skinker, Jr.,* for appellant.

440

*D. D. McDonald* and *G. C. Murrell* for respondent.

HYDE, C.—This is an appeal of the St. Louis-San Francisco Railway Company from the judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission in regard to grade crossings in the city of Cuba. Appellant's main line, between St. Louis and Springfield, runs approximately east and west through Cuba. The depot, principal switch tracks and the junction of the Salem branch with the main line is in the eastern part of the city. The business district of Cuba is about one-half mile west of the depot. Business buildings are located on both sides of the railroad, but most of the stores are on the north side. State Highway No. 19 is routed north and south through Cuba on Buchanan

Street, which is located about 2200 feet west of the depot and crosses the railroad track at grade. Smith Street, 220 feet west of Buchanan Street, likewise crosses the railroad at grade, and Hickory Street, 230 feet west of Smith Street, also crosses appellant's tracks on a grade crossing. In the business district of Cuba, appellant has a commercial track on the south side of its main track, so there are two tracks at each of the three street crossings.

In 1929 there was a fatal accident at the Hickory Street crossing (the crossing farthest west) and, at the suggestion of the Commission, appellant installed a flasher-light type of automatic bell signal on each side of the crossing. In 1931 appellant and the State Highway Commission filed with the Public Service Commission a joint application for the location and establishment of an underpass crossing of the highway at the railroad tracks (about half way between the depot and the business district) 870 feet east of Buchanan Street. The application stated that they had agreed upon the construction and maintenance cost of the underpass and also stated that, upon the completion of the underpass, the grade crossings at Buchanan and Hickory Streets would become useless and of no benefit to the trave ing public and should be ordered closed. The city of Cuba protested the closing of either of these crossings. There was no controversy about the underpass, the issue before the Public Service Commission being whether two of the three street crossings at grade should be abolished. If both of them were closed the only connection across the tracks in the business district would be on Smith Street (the crossing between them), which was the principal business street of the city. It was estimated that the normal traffic through the highway underpass would be 1,000 vehicles per day; that at times this would be as much as 2,000 vehicles per day; and that if both the other crossings were closed "a maximum of 250 vehicles would' use Smith Street crossing of necessity" daily. The railroad traffic consisted of twelve passenger trains, eight through freight trains and one local freight train per day. Passenger trains, which did not stop at Cuba, passed over the street crossings at a speed of 60 miles per hour, while freight trains which did not stop passed at 35 miles per hour. The grade through Cuba was uphill going west and passenger trains, which did stop, passed the grade crossings at from 25 to 45 miles per hour, their speed depending upon the direction they traveled. Freight trains which stopped passed at from 18 to 25 miles per hour.

On the north side of the railroad track running parallel with it between the business district and the proposed underpass was north Main Street. Approaching any of the three street crossings from the north, the view was unobstructed so that a train could be seen

as far east as the depot, when 75 feet from the track. From this distance, it was also possible, at any of the three crossings, to see a train about 400 feet west of Hickory Street. The approach from the north was a slightly descending grade while from the south the approach was up grade. However, on the south side of the track, there were oil tanks, a mill and other buildings, on the railroad right of way, which obstructed the view, and it was also further obstructed by standing cars on the commercial track. South of the railroad right of way was south Main Street which ran from the business district to the highway underpass, with the exception of a short distance closed at the east end. Approaching the crossings from the south, a traveler could not see in either direction on the main line, after approaching within 75 feet of the track because of the buildings and other obstructions, until he came within 25 feet of it. When cars were standing on the side track, the view of the main line track was obstructed until the side track, which was only 14 feet from the main track, was crossed. The chief engineer of the railroad testified: ''With the additional traffic that will be thrown on Smith Street because of the closing of Buchanan and Hickory streets, if the streets are closed, I think the flashing lights now located on Hickory Street should be moved on Smith Street, or similar protection provided, if the two crossings at Buchanan and Hickory streets are closed.''

Evidence on behalf of the city tended to show that the Smith Street crossing alone would be insufficient; that because of automobiles parked on Smith Street the traveling space on it was at times reduced to 15 feet; that because of this condition and the congestion of travel on it, the danger to people crossing the railroad would be greater with only that crossing than it would if there were three crossings; and that trains stopping at the depot sometimes backed up across Smith Street and remained there for ten or fifteen minutes, which made it necessary to go to Hickory Street to cross the tracks. It was also shown that the fairgrounds were on Hickory Street; that this crossing was used for going to the fair; that closing it would throw an extreme amount of traffic on Smith Street during fair time; and that Cuba had a population of about 814 people, about one-third of which lived on the south side of the tracks. A traffic count made by the railroad of traffic on Sunday, January 18, 1931, showed more traffic that day on Hickory Street than on Smith Street. Exhibits introduced show that the post office and several churches are located on Hickory Street. The conclusions of the Commission about the matter were as follows:

''In considering the matter of closing the Hickory and Buchanan street crossings, the Commission must first look into the element of

hazard. There is a marked similarity in the physical conditions of these two crossings and that at Smith Street. The grades of the approaches to the crossing are practically the same, and the distances that approaching trains can be seen are substantially the same. Before the flasher-light signal was installed at Hickory Street the degree of hazard was approximately the same at all three crossings.

"After investigation of the above-mentioned accident, the Commission concluded that flasher-light and bell signals at the Hickory Street crossing would protect the traveling public at said crossing and ordered same installed. There have been no physical changes at said Hickory Street crossing since said installation, and the Commission is of the opinion that said crossing is not unusually hazardous and should not be closed at this time.

"The Commission is of the opinion that the Smith Street and Buchanan Street crossings are unusually hazardous.

"The evidence shows that a large percentage of the traffic now using the Buchanan Street crossing will be diverted over Highway Route No. 19 and through the proposed subway, and that the closing of the Buchanan Street crossing will not greatly inconvenience the residents of Cuba. The Commission is of the opinion, therefore, that two unusually hazardous grade crossings, located only 200 feet apart, should not be permitted to exist and that said Buchanan Street crossing should be closed and abandoned.

"The Commission is of the further opinion that flasher-light signals, of an approved type, should be erected at the Smith Street crossing to protect the traveling public. A constant source of danger exists at any crossing where a traveler cannot see an approaching train because of obstructions.

"The obstructions in this case are on the company's right of way and have been placed there by the company or with its permission. Without them, the crossing would not be unusually hazardous. The company should, therefore, be charged with the responsibility of protecting the traveling public and should bear the entire cost of installing the flasher-light signals at the Smith street crossing."

The Commission made an order in accordance with these conclusions and, after a rehearing was denied, the railroad brought the matter before the Circuit Court of Cole County on petition of review. The circuit court entered judgment affirming the order of the Commission and the railroad has appealed from this judgment.

■■■ Appellant contends that the order of the Commission is arbitrary, unlawful and unreasonable in refusing to abolish the Hickory Street crossing. The Commission has authority, under Section 5171, Revised Statutes 1929, to alter or abolish any grade crossing. [See, also, State ex rel. Rutledge v. Public Serv. Comm., 316

444

Mo. 233, 289 S. W. 785.] The Commission also has power, under Section 5239, Revised Statutes 1929, for the purpose of promoting public safety to prescribe "the installation, use, maintenance and operation of appropriate safety and other devices or appliances, including interlocking and other protective devices at grade crossings or junctions." "Upon this review, the question is not whether the court, if the matter were before it, would make the same order made by the Commission, but only whether, the order as made by the Commission is reasonable and lawful. [Sec. 5234, R. S. 1929.] To justify a reversal of an order of the Commission falling within its discretionary power on the ground that such order is unreasonable, it must appear that the action of the Commission was arbitrary or without reasonable basis." [State ex rel. Alton Transportation Co. v. Public Serv. Comm., 330 Mo. 1, 49 S. W. (2d) 614.] Under Section 5247, Revised Statutes 1929, the burden of showing that the Commission's order is unreasonable or unlawful is upon appellant. The view of appellant is that all through vehicular traffic and most of the local traffic, between the parts of the city on each side of its tracks, could use the underpass and thus avoid the use of a grade crossing in the business district. Even disregarding the matter of additional distance, it must be recognized that local traffic driving on or off or across a modern through highway would not be without hazard to the people of the city and to those traveling the highway. There was also evidence of probable congestion on Smith Street, if it was the only crossing in the business district, which would increase rather than diminish the grade crossing hazard. There was also evidence that it was often blocked by trains. All these considerations were for the Commission to weigh and determine in the interest of public convenience and safety, and we think that the evidence clearly justified its conclusions and that its order closing the Buchanan Street crossing and leaving open the Hickory Street crossing was not arbitrary and without reasonable basis.

■ Appellant next contends that the requirement, that it at its own expense install a flashing light bell signal at Smith Street crossing, is unreasonable and unlawful and is not supported by the evidence. Appellant admitted that such protection was necessary there if it was the only grade crossing and we do not think that, under the evidence, the Commission's order requiring it was unreasonable, when two crossings remained. Furthermore, the conditions at both were practically the same, and appellant had, when its necessity for protection of the public was suggested, installed one at Hickory Street.

■ Appellant says also that the Commission was without power to impose this requirement because no such issue was raised by the pleadings before the Commission. "A complaint under the Public

Service Commission Law is not to be tested by the technical rules of pleading; if it fairly presents for determination some matter which falls within the jurisdiction of the Commission, it is sufficient. On the question of jurisdiction in the instant case we are not so much concerned with the form and substance of the complaint as with the nature and extent of the order made and the considerations upon which it was based.'' [State ex rel. Kansas City Terminal R. R. Co. v. Public Serv. Comm., 308 Mo. 359, 272 S. W. 957; see. also, C. R. I. & P. Ry. Co. v. State Highway Comm., 322 Mo. 419, 17 S. W. (2d) 535.] The matter before the Commission here, was the construction of an underpass for a State Highway which crossed at grade and what should be done about this grade crossing and two others in the business district of Cuba after the underpass was completed. The question of proper safety signals was necessarily a matter related to and to be considered in connection with this paramount issue, regardless of whether one or all of the crossings were left open. Appellant recognized this by introducing evidence as to what signals were proper if only Smith Street, which it did not suggest closing, was left open. The order of the Commission was not unlawful for exceeding its jurisdiction in the case.

The final contention of the appellant, that the requirement of the safety signal was unlawful, is that the effect of that part of the order is to take and damage the property of appellant for public use without just compensation in violation of Section 21, Article II, of the Constitution of Missouri, and to deprive the Railroad of its property without due process of law in violation of Section 30, of Article II, of the Constitution of Missouri and Section 1 of the Fourteenth Amendment of the Constitution of the United States. Such a contention has been overruled by this court in State ex rel. Kansas City Term. Railroad Co. v. Public Service Comm., 308 Mo. 350, 272 S. W. 957, and C. R. I. & P. Ry. Co. v. Public Service Comm., 315 Mo. 1108, 287 S. W. 617, and by the Supreme Court of the United States in Erie Railroad Co. v. Board of Public Utility Commissioners, 254 U. S. 394, 65 L. Ed. 322, 41 Sup. Ct. Rep. 169. It is a matter of the exercise of the police power of the State in the interest of public safety. The cost of such an improvement cannot be imposed upon a railroad merely because it is a railroad, but, where the presence of the railroad company's tracks and the condition of its right of way makes a public street crossing dangerous and hazardous to the public, the State has a constitutional right to require improvements which will decrease the danger. As said by this court in the Rock Island case (315 Mo. l. c. 1114) : ''Take away the railroad (and also here the obstructions to the travelers' view which it has permitted upon its right of way) and there would be no more

need or occasion for a viaduct than for a Chinese pagoda. Hence, under the rulings referred to, the necessity for the overhead crossing (here the automatic signal) being caused solely by the railroad track (and here the obstructions on its right of way), the Commission, with entire propriety, might have apportioned the entire cost . . . to the railroad company."

The judgment is affirmed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE C., is adopted as the opinion of the court. All of the judges concur.